# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No. 1:26-cv-398

Fida Alfridi Muhammad, Arvind Jumar Kopparapu, and Oyebode Kazeem Majekodunmi ,

    Plaintiffs,

v.

CHARTER COMMUNICATIONS,

    Defendants.

## COMPLAINT

COMES NOW Plaintiffs, Oyebode Kazeem Majekodunmi ("Kazeem"), Fida Alfridi Muhammad ("Fida") and Arvind Kumar Kopparapu ("Arvind") (collectively "Plaintiffs") by and through his attorney, Matthew C. Hailey, Hailey Law Firm PLLC, and hereby submits their Complaint against Defendant, Charter Communication, and as grounds therefore, alleges the following:

### I. JURISDICTION AND VENUE

1. This action is authorized and instituted pursuant to Title VII of the Civil Rights of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, as amended; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, as amended; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, as amended; and Section 1981 of the Civil Rights Act of 1991, 42 U.S.C. § 1981.

2. Jurisdiction in this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

3.  The unlawful employment practices alleged herein were committed within and around the jurisdiction of the United States District Court for the District of Colorado.

4.  Jurisdiction and venue are thus proper in this Court pursuant to 28 U.S.C. § 1391(b).

## II. PARTIES

5.  Defendant Charter Communications Companies (hereinafter "Charter") is a Delaware corporation with principal offices located at 400 Washington Blvd, Stamford, CT 06902.

6.  At all times relevant, Defendant Charter is and was an "employer" within the meaning of Title VII, the ADA, and ADEA for purposes of these statutes. Charter is a "person" within the meaning of 42 U.S.C. § 1981.

7.  Defendant is an American broadband connectivity company and cable operator with approximately 32 million customers in 41 states, and has its Colorado offices located at 6299 S. Fiddlers Green Cir in Greenwood Village, Colorado.

8.  Arvind is present in the United States under an H1B Visa, a 40-year old Indian National, an engineer and a resident of Parker, Colorado.

9.  At all times relevant, Arvind was an "employee" of Defendant for purposes of the above-referenced statutes, and a protected "person" under 42 U.S.C. § 1981.

10. Kazeem is a naturalized citizen of the United States, a 44-year old African, was a Principal Wireless Engineer 1, and a resident of Aurora, Colorado.

11. At all times relevant, Arvind was an "employee" of Defendant for purposes of the above-referenced statutes, and a protected "person" under 42 U.S.C. § 1981.

12. Fida is a naturalized citizen of The United States, a 40-year old from Pakistan, an engineer and a resident of Parker, Colorado.

13. At all times relevant, Fida was an "employee" of Defendant for purposes of the above-referenced statutes, and a protected "person" under 42 U.S.C. § 1981.

### III. ADMINISTRATIVE PREREQUISITES

14. On or about February 24, 2025 Fida filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination, Defendant's failure to provide reasonable disability accommodations, and retaliation due to his race, national origin, age and/or disability. More than 180 days passed without the CCRD issuing a cause finding on Fida's claim, and on November 5, 2025 Fida requested the issuance of a Notice of Right to Sue. On November 5, 2025, the CCRD issued its Notice of Right to Sue.

15. On or about February 24, 2025 Arvind filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation due to his race, national origin, age and/or disability. More than 180 days passed without the CCRD issuing a cause finding on Arvind's claim, and on November 5, 2025 Arvind requested the issuance of a Notice of Right to Sue. On November 5, 2025, the CCRD issued its Notice of Right to Sue.

16. On or about February 24, 2025 Kazeem filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination, and retaliation due to his race, national origin, age and/or disability. More than 180 days passed without the CCRD issuing a

cause finding on Kazeem's claim, and on November 5, 2025 Kazeem requested the issuance of a Notice of Right to Sue. On November 5, 2025, the CCRD issued its Notice of Right to Sue.

17. All necessary administrative prerequisites to the filing of Plaintiffs' lawsuit have been satisfied.

18. Plaintiff's have received a Notice of Right to Sue from the EEOC.

## IV. FACTUAL ALLEGATIONS

19. **Introduction.** During their employment by Charter, Plaintiffs were subjected to verbal and non-verbal slights, unwarranted disciplinary actions, and eventual termination of employment based on their race, nation of origin and protected disability.

20. Defendant unlawfully denied Plaintiffs equal terms, conditions and benefits of their employment, violated Fida's disability accommodations, and placed unrealistic performance standards on Plaintiffs which were not place on white employees, in order to set them up for unwarranted disciplinary actions, retaliated against them for protected activity and, ultimately, terminated Plaintiffs' employment.

21. Plaintiffs have suffered degradation at the hands of their manager, supervisor and others, with substantial mental and emotional injury, economic loss and other damages. Plaintiffs bring this lawsuit to hold Charter accountable for violation of their legal rights as employees.

22. **Fida's Personal and Professional Background.** Fida immigrated to the United States from Pakistan, and later achieved citizenship here. He has since worked incredibly hard to create a better life for himself and his family. Eventually reaching the level of a Principal Engineer 2 RAN Subject Matter Expert with Defendant. He worked as a contractor for

Defendant from February 14, 2021 to April 10, 2022, and then a full time employee with Defendant from April 11, 2022 to October 4, 2024.

23. **Fida was successful as a Charter Engineer.** On or about February 14, 2021, Fida became employed as a Contractor for Defendant, and on or about April 11, 2022 he was hired as a full time employee. As an Engineer, Fida was recognized as a top performer, consistently achieving targets and receiving positive feedback from both his peers and cross functional executives.

24. Fida enjoyed his job as Principal Engineer 2, working across his team, engaging in problem solving and troubleshooting to solve issues in RAN.

25. Fida was well respected by his co-workers and supervisors, who acknowledged his teamwork and other strengths and rated him fairly and favorably in his performance evaluations. For example, he received praise for his ability to collaborate effectively with cross-functional teams, ensuring seamless integration of RAN solutions across departments.

26. Fida also received many "Sparks of Appreciation" from executives and team leads, showing his commitment to excellence and collaboration. These included praise and appreciation form David Kelin, the Product Director, Dennis Cannoy, Senior Director RAN Development, Muhib, Senior Director RAN Engineering and Linda, Senior Product Manager.

27. **Arvind's Personal and Professional Background.** Arvind came to the United States under the H1B visa program. He started working for Charter as a contractor, and after two years he was hired as a full time employee. He worked for four years as a full time employee with Charter, as a valued member of the RAN Engineering team, in design and performance.

28. Prior to his team being taken over by Johnnathan Levin, his performance reviews were more than satisfactory, and he had never been formally or verbally informed of any

performance concerns. In his July 22, 2024 mid-year review he received feedback focused on refining the test plan with no mention of any performance issues or inadequate employment performance.

29.     **Kazeem's Personal and Professional Background.** Kazeem immigrated from Africa and is currently seeking asylum in The United States. He was hired as an Engineer with Charter, and was a committed and valued employee.

30.     Kazeem consistently met expectations and received favorable reviews and praise from his coworkers, colleagues, and supervisors. In his 2022 review Kazeem as noted as being "always practive in supporting the maintenance and improvement activities for our labs (VCS2 and CTEC2)." His manager, Joerg Ahrweiler noted "Kazeem has proven good communication toward our vendors, … . He has demonstrated resiliency and flexibility in situation where we needed to apply consistent 'pressure' on their support efforts, e.g. resolving various problems with our NDAC systems."

31.     In his 2023 performance review Kazeem met all expectations. His manager, Muhib Oduwaiye, stated that "Kazeem has proven to be a crucial addition to the team; his technical knowledge in field tests and analysis have been significantly leveraged and continues to be as we go into 2024."

32.     **Arvind Experiences Race and National Origin Discrimination.** Following his exceptional July 22, 2024 mid-year review, Arvind's supervision was transferred to Johnathan Levin (Caucasian). On information and belief Mr. Levine was at all times an employee of Charter.

33. Upon this transfer, Arvind was almost immediately placed on a Performance Improvement Plan, despite never receiving unsatisfactory employment reviews, never receiving written disciplinary notices and never receiving verbal disciplinary notices.

34. As further described herein, the new management team under the direction of Johnathan Levine, subjected Arvind to unrealistic and unobtainable performance improvement goals, disparate scrutiny, and unwarranted criticism and disciplinary action. No Caucasian employee suffered this same fate.

35. Following the transfer of supervision to Johnathan Levine, and up to the date of Arvind's termination, no Caucasian employees were place on a Performance Improvement Plan. Within the span of one month from when Johnathan Levine took over the supervisory role, three exceptional employees, all persons of color, were summarily placed on Performance Improvement Plans, all with unrealistic and unobtainable improvement goals, which eventually lead to the termination of their employment. No white employee suffered this same fate.

36. **Kazeem Experiences Race and National Origin Discrimination.** Kazeem had a mid-year review in late July 2024 in which no disciplinary issues or performance issues were raised by his manager. This mid-year review as consistent with all of his prior reviews showing that Kazeem was meeting or exceeding expectations. Kazeem was then transferred under Johnathan Levine (Caucasian), and, just like other minority employees transferred under Johnathan Levine, he was met with unrealistic and unobtainable performance standards. These standards were a pretext for placing Kazeem on Performance Improvement Plan, with the end goal of terminating Kazeem's employment, just like other minority employees.

37. Just like Arvind, following the transfer of management, Johnathan Levine did not place unrealistic and unobtainable performance expectations on any Caucasian employee, and he

-7-

did not place any Caucasian employees on a performance improvement plan. He did not terminate any Caucasian employee. Johnathan Levine used these manufactured performance issues as a pretext to terminate Kazeem's employment, when the real reason for the termination of his employment was due to his race and nation of origin.

38. **Fida Experiences Race and National Origin Discrimination.** Just like Arvind and Kazeem, Fida had a very good mid-year review in late July 2024, in which he was meeting or exceeding all expectations. There were not performance issues brought to the attention of Fida, and no disciplinary issues were raised during this mid-year review. However, within one month of transferring management to Johnathan Levine, Fida was place on a Performance Improvement Plan, just like Arvind and Kazeem, and given unrealistic and unobtainable performance standards as a pretext for terminating Fida's employment.

39. Johnathan Levine did not place any Caucasian employees on a performance improvement plan, and specifically targeted minority employees for disparate treatment.

40. Johnathan Levine set the expected performance standards at an unrealistic expectation so that they could never be met, and he could have a pretext for terminating his minority employees, in favor of his Caucasian employees.

41. **Fida requires accommodation for a disability**. Fida suffers from a documented disability of stuttering, that has been medically diagnosed. This disability was well known to his supervisory personnel, including after his transfer to Johnathan Levine.

42. Prior to his transfer to Jonathan Levine, Fida did not have to engage in formal public speaking or formal demonstrations, either within Charter or to external customers.

43. Johnathan Levine, as part of the performance improvement plan, forced Fida to engage in public speaking and demonstrations, knowing that he suffered from a medically

-8-

documented speech impairment, namely a stutter. After providing his speeches and demonstrations, Johnathan Levine told Fida that needed someone that can "communicate effectively" and provided no accommodations for the Fida's medically documented disability.

44. Should Defendants challenge Fida's status as a qualified individual with a disability under the ADA, expert medical evidence will be presented to establish that that his speech impediment substantially limits him in major life activities as compared to an average person in the general population.

45. At all times relevant, Johnathan Levine was informed and aware of Fida's requirement for accommodations.

46. **Defendant's breach their contract of employment with Plaintiffs.** Following the transfer to Johnathan Levine, all three Plaintiffs were almost immediately place on performance improvement plans. This is despite the fact that all three Plaintiffs were exceptional employees, either meeting or exceeding expectations in all of their prior performance reviews.

47. Plaintiffs' mid-year reviews were completed on or about July 18, 2024, all without any documented performance issues or recommendations for improvement. The mid-year reviews outlined expectations for each of the Plaintiffs in their employment roles, but did not mention any anticipated disciplinary actions. One month later, on or about August 14, 2024 all three Plaintiffs were placed on Performance Improvement Plans by their new supervisor.

48. The placement of all three Plaintiffs on Performance Improvement Plans in such an accelerated timeline is in direct contradiction with the employee handbook and outline for disciplinary actions.

49. According to the Charter Communications <u>Leadership Guidelines For Management & Human Resources</u> "The first ninety (90) days of employment, transfer for

promotion to a new position are considered an Initial Introductory Period, as stated int eh Employee Handbook." "After the Introductory Period has expired, performance issues and policy violations may be managed through the corrective action process outlined in this document."

50. All three Plaintiffs were transferred to a new position under Johnathan Levine in the middle of July 2024, and all three Plaintiffs were placed on Performance Improvement Plans within 30 days of this transfer. This is despite the mandate from Charter that that first 90 days following a transfer are considered and Introductory Period, and disciplinary actions are to be taken after this Introductory Period has expired.

51. This Guideline outlines the levels of corrective action to be taken "When informal coaching sessions have not brought about the desired improvement." These steps are (1) Documented Warning, (2) Written Warning, (3), Final Warning and (4) Termination of Employment.

52. Plaintiffs were never given "informal coaching sessions" by Johnathan Levine, were not given documented warnings, or even written warnings. Within 30 days of becoming Plaintiffs' supervisor, Johnathan Levine gave all three Plaintiffs their Final Warning by instituting the performance improvement plans, with the intent of hiding the discriminatory termination of Plaintiffs' employment.

53. The <u>Guidelines</u> do outline certain behaviors that are considered so serious that acceleration of the progressive corrective action process would be justified, up to an including immediate termination of employment. However, none of the outlined behaviors are applicable to Plaintiffs. Johnathan Levine's refusal to abide by the Initial Introductory Period, and the

Progressive Corrective Action Process is a violation of the express and inherent contract of employment between Plaintiffs and Charter.

54. **Plaintiffs suffered discrimination based on race and nation of origin.** As outlined, none of Caucasian employees under the supervision of Johnathan Levine suffered the same fate as Plaintiffs, all of whom are persons of color. No Caucasian employee had accelerated disciplinary actions place on them by Johnthan Levine. All Caucasian employees were afforded the 90 day Initial Introductory Period outlined in the Management Guidelines, and Johnthan Levine separated persons of color for disparate treatment, even going so far as to violate Charter's internal requirements for progressive disciplinary action, in order to terminate Plaintiffs.

55. **Plaintiffs suffer retaliation at the hands of Johnathan Levine and Defendant.** Prior tl July, 2024 the project group that Plaintiffs were assigned to was developing products and processes for Charter. Simultaneously, the group lead by Johnathan Levine were attempting to develop products and processes to fill the same requirements as those being developed by Plaintiff. However the products and processes developed by Johnthan Levine's group were far inferior to those developed by Plaintiffs

56. Plaintiffs were then transferred under the supervision of Johnathan Levine in the middle of July, 2024, and, within thirty days Johnathan Levine placed them on Performance Improvement Plans, without any prior disciplinary actions, warnings or notice of any performance issues. In this performance improvement plan Johnthan Levine imposed unrealistic and unobtainable expectations for Plaintiffs to ensure that they would fail. This was a guise used by Johnathan Levine and Defendant to attempt a termination of Plaintiffs' employment in retaliation for producing superior products and processes as outlined above, and to take credit for

such products and processes. Defendant, through Johnathan Levine, retaliated against Plaintiffs for their superior work product, and Johnathan Levine's termination of Plaintiffs was to protect himself and his team from the consequences of is inferior work product.

57. After Plaintiffs were place on the Performance Improvement Plans they provided their good faith objections to this action. Plaintiffs outlined the disparate treatment afforded them, in Defendants violation of their own internal policies and procedures for progressive corrective actions, coupled with Plaintiffs entire work history with satisfactory or above satisfactory performance reviews.

58. Plaintiffs' objections constituted good-faith opposition to employment practices they reasonably believed to be discriminatory, retaliatory, and unfair, and therefore constituted protected activity under Title VII and 42 U.S.C. § 1981. While no formal HR report was filed, Plaintiffs' internal objections documented within the PIP process constituted informal opposition under law and were sufficient to trigger statutory protection.

59. Shortly after Plaintiffs engaged in this protected activity, Defendant subjected Plaintiffs to adverse employment actions, including termination. The close temporal proximity between Plaintiffs' protected opposition and their terminations, combined with Defendant's deviation from its own corrective action policies, supports an inference of retaliatory motive. Defendant's stated reasons for terminating Plaintiffs were pretextual and inconsistent with Plaintiffs' prior performance history, the lack of progressive discipline, and Defendant's failure to provide a good-faith opportunity for improvement.

## VI. STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**(Race/National Origin Discrimination in violation of Title VII & § 1981)**

1. Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

2. As demonstrated by the words, acts and conduct of Johnathan Levine, Defendants knowingly and willfully engaged in illegal employment practices that discriminated against Plaintiffs because of their race and national origin.

3. As alleged herein, Defendant denied Plaintiffs the same benefits, privileges, terms and conditions of their contractual relationship with Defendant that are enjoyed by persons and employees who are not persons of color.

4. Defendants' unlawful, discriminatory acts and conduct were committed with malice or with reckless disregard for Plaintiffs' protected rights under Title VII and 42 U.S.C. § 1981.

5. As a direct and proximate result of Defendant's malicious and/or reckless discriminatory acts and conduct, Plaintiffs have suffered and continue to suffer lost wages and benefits, loss of gainful employment, mental and emotional stress, humiliation, mental anguish, loss of self-esteem, inconvenience, loss of enjoyment of life, professional reputational damage, and other consequential injuries, damages and losses.

**SECOND CLAIM FOR RELIEF**
**(Disability discrimination in violation of the ADA)**

6. Plaintiff Fida hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

7. Fida is a qualified individual with a disability under the ADA.

8. Fida requested a reasonable accommodation.

9. Defendant failed to grant Fida an accommodation for public speaking or formal demonstrations.

10. Defendant then specifically used Fida's documented and protected disability as part of the justification for terminating his employment with Defendant.

11. Despite his long tenure with the company, and qualifications for the positions, Defendants denied Fida his accommodation by requiring him to engage in formal public speaking, and terminating his employment because Defendant "needed someone that could communicate better" in violation of the ADA.

12. Defendants' unlawful, discriminatory acts and conduct were committed with malice or with reckless disregard for Fida's protected rights under the ADA.

13. As a direct and proximate result of Defendants' malicious and/or reckless discriminatory acts and conduct, Fida has suffered and continues to suffer lost wages and benefits, loss of gainful employment, mental and emotional stress, humiliation, mental anguish, loss of self-esteem, inconvenience, loss of enjoyment of life, professional reputational damage, and other consequential injuries, damages and losses.

**FOURTH CLAIM FOR RELIEF**
**(Race, National Origin & Age Discrimination in violation of the ADEA, Title VII & § 1981)**

14. Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

15. As persons of color from Africa, Pakistan and India, Plaintiffs are within the class of persons protected by the CADA, Title VII and § 1981.

16. Plaintiffs were successful long term employees of Defendant. All of their prior performance reviews were either satisfactory or exceeding expectations, without any mention of needs for improvement.

17. By the middle of July 2024, they were all given their midyear performance reviews and all of them were satisfactory, without any mention of needs for improvement.

Within 30 days from being transferred to their new supervisor, Johnathan Levine, all three Plaintiffs were placed on performance improvement plans. This is in direct violation of the Initial Introductory Period required under Defendant's Management Guidelines, as well as violating the requirement for progressive disciplinary action.

18. Johnathan Levine did not engage in this conduct with any Caucasian employee that was under his supervision, and directly target persons of color and nations of origin other than the United State. The Performance Improvement Plan was a pretext to hide his discriminatory and unlawful treatment of Plaintiffs.

19. Defendant denied Plaintiffs equal terms, conditions and benefits of their employment because of their race and National Origin.

20. Defendants' unlawful, discriminatory acts and conduct were committed with malice or with reckless disregard for Plaintiffs' protected rights under the ADEA, Title VII and 42 U.S.C. § 1981.

21. As a direct and proximate result of Defendant's malicious and/or reckless discriminatory acts and conduct, Plaintiffs have suffered and continue to suffer lost wages and benefits, loss of gainful employment, mental and emotional stress, humiliation, mental anguish, loss of self-esteem, inconvenience, loss of enjoyment of life, damaged professional reputation and other consequential injuries, damages and losses.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Employment Contract)

22. Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

23. Plaintiffs were long term employees of Defendant, with favorable employment reviews and no history of disciplinary actions or poor performance reviews. Defendant has a written policy to address poorly performing employees, or employees that need improvement in their production or performance. This is an implied contract between Defendant and Plaintiffs regarding their employment, probationary periods, Initial Introductory Periods, Progressive Corrective Action requirements, and justification for termination of employment.

24. Plaintiffs all had satisfactory or above satisfactory employment reviews up to July, 2024, when their employment was transferred under the supervision of Johnathan Levine. Under Defendant's Management Guidelines, the first 90 days after an employee is transferred, is to be considered an Initial Introductory Period, and any corrective action needs to wait until after this period elapsed. Johnathan Levine breached this requirement and placed all three Plaintiffs on performance improvement plans within 30 days of the transfer to his supervision.

25. Defendant has written policies and procedures for progressive corrective action in the Management Guidelines, and outline the progressive nature of disciplinary actions. The steps to be taken are (1) Coaching, (2) Documented Warning, (3) Written Warning, (4) Final Warning, and (5) Termination. The Management Guidelines outline certain exceptions to following these steps, none of which are applicable to the circumstances surrounding Plaintiffs' termination of employment. By failing to abide by the progressive correction actions outlined in Defendant's own policies and procedures, Defendant breached the implied employment contract and wrongfully terminated Plaintiffs' employment.

26. As a direct and proximate result of Defendant's malicious and/or reckless breach of contract, Plaintiffs have suffered and continue to suffer lost wages and benefits, loss of gainful employment, mental and emotional stress, humiliation, mental anguish, loss of self-esteem, inconvenience, loss of enjoyment of life, damaged professional reputation and other consequential injuries, damages and losses

### SIXTH CLAIM FOR RELIEF
### (Retaliation for Protected Activity)

27. Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

28. Taking adverse employment action for reporting illegal activity is wrongful termination in Colorado. Further, Plaintiffs' objections constituted good-faith opposition to employment practices they reasonably believed to be discriminatory, retaliatory, and unfair, and therefore constituted protected activity under Title VII and 42 U.S.C. § 1981.

29. After reporting the wrongful employment practices engaged by Johnathan Levine, Plaintiffs' employment was terminated. The stated reasons for Plaintiffs' termination of employment was pretextual, and not supported by Plaintiffs' work history and prior satisfactory and above satisfactory performance reviews. The temporal proximity of Plaintiffs' termination of employment and reporting of the wrongful violation of defendant's own employment procedures support the proposition that Plaintiffs' termination of employment was in retaliation to the reporting of the wrongful employment practices.

30. As a direct and proximate result of Defendant's retaliatory termination of Plaintiffs' employment, Plaintiffs have suffered and continue to suffer lost wages and benefits, loss of gainful employment, mental and emotional stress, humiliation, mental anguish, loss of

self-esteem, inconvenience, loss of enjoyment of life, damaged professional reputation and other consequential injuries, damages and losses

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, and all relief as allowed by law including, but not limited to, the following:

    a.    Economic damages, including back pay and lost fringe benefits;

    b.    Reinstatement or, in the alternative, front pay and benefits;

    c.    Compensatory, special and consequential damages, including, but not limited to past and future non-pecuniary losses, mental and emotional stress, humiliation, mental anguish, loss of self-esteem, inconvenience, loss of enjoyment of life, and other non-pecuniary losses;

    d.    Punitive damages on all claims allowed by law;

    e.    Pre-judgment and post-judgment interest at the highest lawful rate;

    f.    Attorney's fees and costs (including expert witness fees), as allowed by law; and

    g.    Such other and further relief as justice requires.

Respectfully submitted this __2__ day of February 2026.

    HAILEY LAW FIRM PLLC

    _/s/ Matthew C. Hailey_
    Matthew C. Hailey, #33003
    P.O. Box 462653
    Aurora, Colorado 80046
    (720) 745-5558
    Matt@ColoradoCompNow.com

    ATTORNEY FOR PLAINTIFFS